In re Petition for DISCIPLINARY ACTION AGAINST David K. PORTER, an Attorney at Law of the State of Minnesota.

No. C2-89-58.

Supreme Court of Minnesota.

Jan. 5, 1990.

William J. Wernz, Director of Lawyers Professional Responsibility, Martin A. Cole, Asst. Director, St. Paul, for appellant.

Thomas Davern, Golden Valley and John D. Hagen, Jr., Minneapolis, for respondent.

## PER CURIAM.

The Director of the Office of Lawyers' Professional Responsibility filed a petition against respondent David K. Porter, alleging that Porter falsified will documents, swore falsely under oath, misappropriated client funds, and mismanaged his attorney trust account. Porter admitted substantially all of the charges, but claimed certain

mitigating factors, including mental illness and voluntary disclosure.

The charges were referred to a referee pursuant to Rule 14(a), Rules on Lawyers Professional Responsibility (RLPR). The referee generally found that the allegations in the petition were proven, and that neither respondent's alleged mental illness nor his voluntary disclosure constituted mitigating circumstances. He recommended that respondent be suspended from the practice of law for nine months. We adopt the referee's fact findings, his conclusions of law, and, with some modification, his recommendation for discipline.

Respondent has a lengthy history of contact with the lawyer disciplinary system. During his thirteen years of practice he has been the subject of investigation six times, and has received two private warnings and three admonitions. Respondent was first warned in 1979 for using a retainer agreement which improperly sought to limit his professional liability. He next was warned in 1980 for an advertisement offering a "Senior Citizen Discount" which was deemed to be misleading because the advertisement omitted certain material terms and definitions.

In 1985 he was admonished for making false statements concerning the qualifications of a judicial candidate in violation of DR 8–102(A), Minn.Code Prof.Resp. (1985), at a time when he was running against an incumbent judge for a judgeship. He sent letters to attorneys suggesting that court staff "wished [the incumbent judge] would leave"—a statement deemed false because Porter refused to identify the staff member or members allegedly making the statement. A year later respondent was admonished for a conflict of interest in accepting employment in litigation, and improperly submitting a proposed court order while acting as attorney for the representative of an estate. He had recommended hiring accountants who were negligent, and caused the estate to suffer a loss, and then later sued the accountants on behalf of the estate. In 1987 Porter was admonished for improperly withdrawing from representing a client six days before the final hearing on an estate. The client later sued him, but the suit was dismissed.

In this case, the Director's petition contained allegations of six counts of professional misconduct arising during the course of respondent's representation of clients in three separate estate matters.

The first three counts involved the Josie Bergren Estate. Respondent had prepared a series of three wills for Josie Bergren. On September 11, 1987, when Bergren signed her third and final will, Porter had only one witness to her signature. The principal beneficiary, who was then present, refused to witness the signature. After the signing, Porter left, ostensibly to return with his secretary to complete the execution formalities. Instead, he went directly to his house. The following Monday he took Bergren's will to his office, directed his secretary, June Sucher, to sign the will as a second witness, and to sign the self-proving affidavit, after which he added her name as a witness to the acknowledgment he had signed the previous Friday. These acts, the referee concluded, violated Rules 1.1, 5.3(c)(1) and Rules 8.4(a), (b), (c) and (d), of the Minnesota Rules Professional Conduct. After Bergren died, Porter prepared court probate documents which contained false statements concerning the execution of the Bergren will. He had Sucher sign a sworn testimony of subscribing witness to the will form and had his client, Bergren's son, sign two statements that the will was duly executed. The statements were signed under penalty of perjury. Porter filed these documents knowing they were false. The Registrar, in reliance on these misrepresentations, signed a Statement of Informal Probate of Will and Order of Informal Appointment of Executor. The referee found that this conduct constituted violations of Rules 1.7(b), 3.3(a)(4), 5.3(c)(1), and Rules 8.4(a), (b), (c) and (d), of the Minnesota Rules Professional Conduct. Later, Bergren's daughter initiated a contest to the will on grounds unrelated to its execution. She deposed Porter on October 28, 1988 during which her counsel questioned him as to whether Sucher had validly witnessed the will. Her counsel then confronted Porter with a copy

of a letter dated September 14 to Arnie Bergren, a beneficiary of the will. Attached to the letter was a stickered note directing Sucher to "Witness and please copy all to Arnie on Damens Drive."

Porter compounded his misconduct by testifying that he went to his office after Bergren signed the will, and immediately returned to her house with his secretary, Sucher. He testified that Bergren and the other witness acknowledged their signatures and Sucher properly signed as second witness. He stated that the stickered "Post it" note was attached to the *will* (rather than the letter) after he left the house. He elaborated by admitting he was "tempted" to "have June just simply witness it but I decided not to." " * * * I decided 'No, I'm going to have June come back to the house and witness the will.' " He attempted to explain that the note had become attached to the September 14 letter rather than the September 11 will because it "just moved around in the file and got stuck there." Porter admitted he knew his testimony at the deposition was false, but lied allegedly because he was "convinced I was going to kill myself that afternoon." When Sucher also was deposed, she could not remember whether she signed the will. She testified that her memory was poor, and she could remember only a few of the over 200. people whose wills she had witnessed in the two years she had worked half-time for Porter. Two days after the deposition, Porter contacted opposing counsel and admitted that he had testified falsely. He also later confessed to Bergren's daughter, and to the new counsel for the estate after he withdrew from representing it. In a subsequent deposition, respondent also admitted that he had testified falsely. The referee found that the false statements in the deposition violated Rules 1.7(b), 3.3(a)(1) and (4), 4.1, and 8.4(b), (c) and (d), Minnesota Rules Professional Conduct.

Respondent handled informal probate of the estate of Marie Gladys Wipplinger. Evelyn Geis, a beneficiary, received two checks from Porter's trust account as distribution of the estate. Geis did not present either check for payment until respondent contacted her after the Assistant Director discovered certain discrepancies in his business and trust accounts.

On July 16, 1987, Porter entered into a loan agreement with First Bank of the Lakes, the bank where his business and trust accounts were then maintained, in connection with a $15,000 personal note payable in one payment due October 14, 1987. He failed to make the payment when due, or any time prior to November 9, 1987, when his business account was debited $8,000 to cover part of the loan. The *trust* account was also debited $7,583.96 for full repayment of Porter's loan. Respondent did not then have $7,583.96 of his own money in the trust account. Before the referee, respondent testified that he was unaware that funds were withdrawn from the trust account, and failed to note the error because he did not check the trust account balance regularly.

However, Porter's banker testified that the bank's standard procedures would not allow debiting funds from a lawyer's trust account without approval from the lawyer. He did note, however, that the serial numbers of the business and trust accounts were only one number apart, and bank personnel had made several errors in the past between the accounts. As soon as he was told about the unpaid Geis checks in November 1988 (by the Assistant Director who was investigating his trust account), respondent testified he deposited the unpaid amount in the trust account and contacted Mrs. Geis. The referee concluded that Mr. Porter had violated Rule 8.4(b), (c), and (d), of the Minnesota Rules Professional Conduct.

During the course of probating the estate of Richard E. Palmer, respondent handled the sale of the Palmer homestead. A $1,000 down payment was deposited in respondent's trust account. He later withdrew some or all of that earnest money belonging to the estate. He claimed that the withdrawal was unintentional and happened because of his own negligence in properly maintaining his accounts, although he did not make restitution for

more than six months despite repeated requests to do so. He rationalized this delay as being "honest procrastination in a matter requiring complex calculations." The referee found that failure to communicate with the client violated Minn.R.Prof.Conduct 1.4(a).

In addition to, and contributing to that misconduct, was the failure of respondent to maintain proper books of account. Porter admitted that he failed to maintain proper cash receipts and disbursement journals or client subsidiary ledgers for each client for whom he held money in trust. He likewise failed to balance his trust account on a monthly basis. The referee found that this laxity in bookkeeping practices failed to comply with the requirements of Minn.R.Prof.Conduct 1.15, and, as well, Amended Opinion 9 of the Lawyers Professional Responsibility Board. Compounding these failures was the fact that respondent had certified for three years to this court that he had maintained books and records in compliance with Rule 1.15. Thus, additionally, the referee found these false certifications violated Minn.R.Prof.Conduct 8.4.

As indicated, although he admitted most of the Director's allegations, Porter alleged his conduct was mitigated by a psychological disorder and by claiming that much of his misconduct would not have come to light without his voluntary revelation of it. Respondent attempted to establish that he was suffering from a bi-polar disorder which mitigated his misconduct in the matter of the Bergren will.[1] The referee concluded that he had failed to meet his burden of establishing mitigation by clear and convincing evidence. We agree.

■ The standard of proof of mitigation by reason of psychological disability was established in *In re Weyhrich*, 339 N.W.2d 274 (Minn.1983):

> [W]e hold that in a case where a respondent attorney raises psychological disability as a mitigating factor, he must prove that he indeed has a severe psychological problem, that the psychological

problem was the cause of the misconduct, that he is undergoing treatment and is making progress to recover from the psychological problem which caused or contributed to the misconduct, that the recovery has arrested the misconduct, and that the misconduct is not apt to recur. Finally, the accused attorney must establish these criteria by clear and convincing evidence.

*Id.* at 279; *see In re Serstock*, 432 N.W.2d 179, 182 (Minn.1988).

Psychological testimony was offered by a psychologist, Dr. Absalom Yellin, Ph.D. Though respondent claimed to have been treated by a psychiatrist, no psychiatric testimony was offered. Dr. Yellin's testimony was based entirely upon what respondent had related to him, and although a psychological test had been given, the test results were not produced in evidence. Dr. Yellin's conclusion was that respondent was suffering from a bi-polar disorder, or manic depression. However, there was far less than clear and convincing evidence that the depression caused the misconduct.

Moreover, the referee also noted that respondent had completely failed to establish that the bi-polar disorder was not likely to recur. Though respondent had been on medication, no evidence of its effectiveness was introduced. The referee likewise observed that contrary evidence existed, casting doubt on the credibility of Dr. Yellin's diagnosis. *See, e.g., In re Daffer*, 344 N.W.2d 382, 385–86 (Minn.1984).

Thus, we conclude, as did the referee, that respondent failed to meet his burden to establish mitigation by clear and convincing evidence, particularly with reference to the elements of causation and that any psychological illness had been arrested and was not likely to recur.

■ In certain circumstances, voluntary disclosure of misconduct by an attorney may mitigate the discipline called for when it is likely that the misconduct would have otherwise gone undetected. *In re*

---

1. Although he offered evidence that indeed he may have had the disorder, no evidence was presented that the illness caused any of the trust account violations except his general testimony that after 1986 his emotional condition had been "basically going to hell."

*Holly,* 417 N.W.2d 263, 263 (Minn.1987); *In re Simonson,* 365 N.W.2d 259, 262 (Minn. 1985). Respondent argues that had he not disclosed his misconduct in the Bergren will matter to his client and opposing counsel, and ordered his attorney to inform the Director's office, it was unlikely his misconduct would have been discovered. We concur with the referee who rejected respondent's claim. Any of the parties to whom Porter disclosed his misconduct could have reported him to the Director, although they did not. Further, in depositions concerning the will contest, opposing counsel questioned both Porter and Sucher at length as to whether she had been present at the will signing. Opposing counsel discovered a "Post-it" note attached to a letter to the beneficiary, directing Ms. Sucher to "Witness and please copy all to Arnie on Damens Drive." Also, the referee in reviewing Sucher's deposition could have concluded that her inability to remember was self-serving rather than genuine. Thus, evidence in the record clearly supports the referee's conclusion that Porter's misconduct could have been discovered without his disclosure.[2]

Moreover, even at the time of the disclosure of the Bergren misconduct, respondent was under investigation by the Director's office with respect to the trust account violations.

■ Respondent asserts that his misappropriation in the Palmer and Geis matters was unintentional and that he remedied it later. Because we deem the maintenance of a separate trust account for client funds to be vital to the protection of clients, we have mandated their maintenance. *See In re Shaw,* 298 N.W.2d 133, 135 (Minn.1980). The attorney has a responsibility to maintain her or his trust account which goes beyond a requirement to refrain from intentional wrongdoing. *Cf.* ABA Standard

4.12 (Suspension is generally appropriate when a lawyer *knows or should know* that he is dealing improperly with client property and causes injury or potential injury to a client.) Although unintentional misappropriation may be less heinous than purposeful misappropriation, "[e]very lawyer is * * * charged with the knowledge that he must maintain a separate account and adequate records." *In re Shaw,* 298 N.W.2d at 135.

In this case, the shortages in the trust account were due to accounting practices which the referee found did not meet the standard of Minn.R.Prof.Conduct 1.15, Respondent allowed over $7,000 to be withdrawn from his trust account to pay off a personal loan. Even if he was unaware that Evelyn Geis had not presented her two checks for payment, the referee found that Porter knew or should have known that the account did not contain $7,500 of his own funds.

■ In the Palmer matter, Porter withdrew what he described as "some odd number of dollars" after he believed he had rectified his bookkeeping even though the Palmer estate representative had been complaining of a shortage for several months. After withdrawing this money (and apparently other amounts at other times), Porter discovered that the trust account was supposed to contain an additional $1,000.00, the earnest money paid for the Porter homestead. Porter said he "immediately put the thousand dollars into the trust account and sent it off to Mr. Palmer * * *." Restitution does not mitigate Porter's misconduct. In the Geis matter, Porter made restitution only after the Director uncovered the discrepancy. In the Palmer matter, Porter made restitution only after several months' delay.

■ Porter asserts that he was unaware from 1986 through 1988 that he had violat-

---

**2.** It also appears that Porter, earlier in 1988, successfully prevented opposing counsel from contacting Corlous Alstad, the witness of the will. Porter sent to Mr. Marker on January 14, 1988, a letter stating that "Mrs. Alstad called last night to tell me that an attorney for Ms. Bergren's daughter had called her and that she would rather not get involved in legal matters with which she has no experience." Alstad's presence would have been required for Sucher to properly witness the will after it was signed. Porter admitted he had been "engaged in a scheme to keep the true facts regarding the circumstances surrounding the execution of the Will" from opposing counsel.

ed any of the rules regarding the maintenance of adequate records, and, therefore, his certification to this court during those years was unintentional. By our decisions we have squarely held, and put this state's lawyers on notice, that they are charged with knowledge of the requirements regulating the handling of client funds, and the duty to certify that they have complied with those requirements. *See Shaw*, 298 N.W.2d at 135.

The referee recommended that Porter be suspended from the practice of law for nine months. This court gives great weight to the determination of the referee, but is the final determiner of appropriate sanctions. *In re Munns*, 427 N.W.2d 670, 671 (Minn.1988). The purpose of discipline is not to punish the attorney but to protect the public. *In re Smith*, 381 N.W.2d 431, 434 (Minn.1986). The court weighs four factors: (1) the nature of the misconduct, (2) the cumulative weight of the disciplinary rule violations, (3) the harm to the public, and (4) the harm to the legal profession. *Id.*

Porter's conduct was serious. When faced with a direct question under oath concerning his own conduct, Porter committed perjury to hide his actions. *Cf. In re Bernstein*, 404 N.W.2d 804 (Minn. 1987); *In re Danna*, 403 N.W.2d 239 (Minn.1987). Also, even if unknowingly, Mr. Porter misappropriated client funds. Misappropriation "is of the most serious degree in attorney discipline matters and almost always results in either disbarment or substantial suspension from the practice of law." *In re Strid*, 439 N.W.2d 721, 721 (Minn.1989).

Porter's numerous violations potentially harmed both the public and the legal profession. Especially harmful was obtaining a falsely subscribing witness to the will in the Bergren matter. Attestations by witnesses are essential to the validity of wills. Several policies underlie the requirement: removing uncertainty about the execution of wills and protecting against fraud and verifying the validity of wills; and preventing the diversion of an estate from those who would take it under the statutes of descent and distribution. *See* 94 C.J.S. *Wills* § 183 (1956). The Bergren case potentially implicated an additional concern: protection of beneficiaries under an otherwise valid will, which becomes subject to attack as a result of a falsely obtained witness signature.

Although for those reasons we deem respondent's misconduct to be serious enough to justify suspension from the practice of law, as did the referee, in view of the conditions precedent to reinstatement that we herein impose, we conclude that an indefinite suspension with no right to petition for reinstatement before a date accruing no less than six months from the date of this opinion is more appropriate. Before reinstatement respondent shall comply with requirements of Rule 18, RLPR. Additionally, in support of any motion for reinstatement, respondent shall prove by clear and convincing evidence that he has overcome any psychological disability which would prevent him from competently and ethically practicing law, and that he has recognized his past misconduct and taken steps to see that it does not recur. Upon readmission to practice, this court reserves the right to place respondent on indefinite probation subject to such conditions that may then be deemed appropriate. Finally, respondent shall pay to the Office of the Director the costs of the present proceeding as provided by Rule 24, RLPR within 90 days from the date of this opinion.