**In re William S. BACH, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 448392).**

No. 07–BG–1389.

District of Columbia Court of Appeals.

Argued Jan. 27, 2009.

Decided Feb. 26, 2009.

William S. Bach, Washington, pro se.

Joseph N. Bowman, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Julia L. Porter, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before REID, Associate Judge, and FERREN and FARRELL, Senior Judges.

FARRELL, Senior Judge:

Respondent, while serving as conservator for the estate of a 92–year–old woman, wrote himself a check from the estate for his services knowing that he was not authorized to do so without court approval, which he had not yet received. The Board on Professional Responsibility, in agreement with a Hearing Committee, concluded that this was intentional misappropriation of client funds and, accordingly, recommends that respondent be disbarred. *See* Rule of Professional Conduct 1.15(a); *In re Addams*, 579 A.2d 190 (D.C. 1990) (en banc).[1]

We accept the Board's conclusions and recommendation, which are supported by its thorough and well-reasoned opinion. We attach the relevant parts of the opinion hereto, with record citations deleted (and footnotes renumbered). We add the following brief discussion that assumes familiarity with the Board's report and chiefly addresses the Board's stated concern that *Addams'* strong presumption of disbarment as the proper sanction for intentional misappropriation may result in an unjust disposition here.

Respondent wrote himself a check for attorney's fees in the amount of $2,500 from the ward's modest estate, knowing that he was thereby violating D.C.Code § 21–2060(a) (2001) and Superior Court Probate Rule 308, both requiring advance court approval of payment for attorney conservator services. As the Board and the Hearing Committee found, his reason for doing so was simple: the ward's nursing home had made a claim against the estate, and respondent was afraid that if he waited for court approval of his fee petition, "there would be no funds left to pay my fees."[2] Respondent thus con-

---

1. The Board also concluded that respondent had violated Rule 1.5(a), which prohibits a lawyer from taking a fee prohibited by law—

something respondent had done by ignoring the requirement of prior court approval.

2. The Board and the Hearing Committee both rejected, as do we, respondent's unsupported

ceded that the act was deliberate, and so he cannot rely on the extenuation we found in *In re Fair*, 780 A.2d 1106 (D.C.2001), where the lawyer had relied on "an ambiguous probate culture" to mitigate her taking of unapproved fees despite a similar statutory bar governing work on decedents' estates. *Id.* at 1113. Respondent, unlike Fair, was under no misapprehension of his duty to obtain advance court approval. Thus, the rule of *Addams* applies, which holds that [b]ecause the "breach of trust" entailed by intentional misappropriation "is so reprehensible, striking at the core of the attorney-client relationship," ... "[o]nly the most stringent of extenuating circumstances [will] justify a lesser disciplinary sanction such as suspension." *In re Pennington*, 921 A.2d 135, 141 (D.C. 2007) (quoting *Addams*, 579 A.2d at 193, 198–99). As the Board correctly found, no such circumstances are present here.[3]

The Board nevertheless has expressed strong misgivings about the justice of applying *Addams'* presumption of disbarment to respondent's case:

> [I]f we had the discretion to do so, we would not subject a lawyer whose only violation consists of prematurely taking a legitimately earned fee to the same draconian sanction that is appropriately imposed on a lawyer who deliberately steals client funds. The latter is undoubtedly far more serious than the former, constitutes an extraordinary violation of the client's trust and more seriously undermines public confidence in the integrity of the legal profession— the underlying considerations cited by the *Addams* Court. *Addams*, 579 A.2d

at 193–94. We have no doubt that the public would recognize that these two forms of misconduct, though both serious, are fundamentally different and that the former warrants a less severe though substantial sanction.... [D]isbarring Respondent effectively equates his misconduct with the most egregious and dishonest misappropriations that victimize clients, and needlessly deprives the Court and an underserved public of a capable conservator who made a single mistake that ultimately caused no harm.

In his brief, Bar Counsel does not address these expressed concerns at all, but we must do so. The Board either is asking the division to craft an exception to the strict *Addams* rule for respondent's behavior, or is implicitly asking the court to reconsider *Addams'* holding that "in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." *Addams*, 579 A.2d at 191. If the former, then we do not think the Board has furnished us with a principle on which to distinguish our prior decisions. Its comparison of respondent to a lawyer who "deliberately steals client funds" appears to stress the fact that respondent was later found to have "legitimately earned [the] fee" he took. But attorneys heretofore disbarred for misappropriation—including Addams himself, *see* 579 A.2d at 192–93—have likewise claimed they had earned or were otherwise entitled to the funds, *see also, e.g., In re Pels*, 653 A.2d 388, 397 (D.C.1995), and the court has

claim that an auditor of the Probate Court had told him that his petition for court approval had been granted.

**3.** We have found "extraordinary circumstances" justifying a lesser sanction under *Addams* "in only one situation: where the

attorney is suffering from a disabling addiction, such as chronic alcoholism, and the addiction is shown to have been the cause of the misconduct." *In re Pierson*, 690 A.2d 941, 950 (D.C.1997).

been unmoved by such expectations of (or wagers on) after-the-fact ratification. *E.g., In re Utley,* 698 A.2d 446, 450 (D.C.1997) (rejecting attorney's reliance on later "ratification").[4]

It is also true, as the Board notes, that respondent did not conceal his self-payment, in the sense that he later disclosed it in his annual accounting (filed over a year after the check was written), thus enabling the probate court through its "supervisory mechanisms" to discover it and take appropriate action.[5] But an attorney who knows he has done what the law forbids may not leave it to chance or the diligence of auditors to bring (or not bring) the action to light; and so the fact that respondent revealed the improper payment confirms only, we think, that he acted without the "moral corruptness" of an intent to deceive—a factor that *Addams* makes irrelevant to deliberate misappropriation and the attendant sanction. *See* 579 A.2d at 196–97. Finally, although respondent committed only a "single mistake" involving a modest sum of client money, *Addams* rejected repetition—or multiple misdeeds—as the key to the required sanction in this area of taking client funds, *see id.* at 198, and we see no difference in principle between an attorney who takes a much larger unauthorized fee and respondent's action in taking money from an estate that (according to his later accounting) totalled less than $12,000.

Consequently, while disbarment may appear "draconian" as applied to respondent's conduct, the Board has not defined for us an exception of principle to *Addams'* rule that does not risk "simply paying lip service" to it. *Pels,* 653 A.2d at 398. Disbarment under *Addams* is not reserved for the "most egregious and dishonest" instances of intentional misappropriation, and the Board's own recommendation of disbarment effectively admits that respondent's conduct differed only in degree, not kind, from cases in which the *Addams* rule has been applied unyieldingly. *See, e.g., In re Robinson,* 583 A.2d 691 (D.C.1990) (attorney disbarred for misappropriation despite relatively small sum involved, quick restoration of funds, lack of financial harm to client, single instance of misappropriation, and attorney's relative inexperience, absence of a prior disciplinary record, and favorable character testimony).

It is probable, therefore, that the Board, without expressly saying so, sees this as a case that invites reconsideration of *Addams.* In that regard, we confine ourselves to restating what the division in *Pels* said in rejecting the recommendation by Board members of a "stay" of disbarment there:[6]

> Individual members of this division ... believe the result *Addams* dictates in this case is a harsh one. On the other hand, ... in *Addams* the court weighed the concern of seemingly unjust application of a categorical sanction to particular cases against "our concern ... that there not be an erosion of public confidence in the integrity of the bar. Simply put, where client funds are involved,

---

4. As the Court of Appeals of Maryland has said, "Arguing that an unauthorized 'advance' was later approved as a fee is little better than arguing that a fiduciary may dip into the client's funds for a 'loan' as long as the money is later repaid." *Attorney Grievance Comm'n of Maryland v. Owrutsky,* 322 Md. 334, 587 A.2d 511, 516 (1991).

5. When the unapproved payment was detected, Judge Burgess held a hearing, removed respondent as conservator, and referred the matter to Bar Counsel.

6. The court rejected a stay of disbarment (in favor of suspension plus probation) because it "believe[d] that would enervate, if not destroy, the deterrent force of the rule reaffirmed in *Addams.*" *Pels,* 653 A.2d at 389.

a more stringent rule is appropriate." *Addams*, 579 A.2d at 198. Whether the paramount goal of deterrence that drove the decision in *Addams* can be achieved by lesser, more case-individual sanctions for misappropriation is an issue the full court is always free to revisit—though with the attendant risk of loss of predictability in our exercise of this most critical feature of our regulatory supervision. The division's obligation in this case, in any event, is clear.

653 A.2d at 398.

Accordingly, respondent William S. Bach is hereby disbarred from the practice of law in the District of Columbia effective thirty days from the date of this opinion.[7]

*So ordered.*

FERREN, Senior Judge, concurring:

I join in the Board's recommendation and the court's opinion ordering disbarment, but only because, as Judge Farrell makes clear, our en banc opinion in *Addams*,[1] decided almost two decades ago,

forces that result. But for *Addams'* virtually *per se* rule requiring disbarment in all cases of intentional misappropriation of client funds, that remedy may be too severe on the facts here. Mitigating factors, when compared with factors in aggravation, may suggest that respondent deserves no more that a suspension of some sort.[2] For the reasons that follow, therefore, I urge the full court to revisit *Addams*.

In urging such reconsideration, I continue to subscribe to the views expressed in my opinion in *Addams* concurring in the result.[3] There, I agreed with "the majority's basic thesis that misappropriation cases are different from other disciplinary cases and therefore call for 'a more stringent rule.'"[4] To me, however, this meant that "in determining the sanction in a nonnegligent misappropriation case, we should begin with a presumption of disbarment"—a presumption, as I see it, that establishes the "more stringent rule"—but then "evaluate and apply all aggravating

---

**7.** Our decision makes it unnecessary to consider Bar Counsel's argument that the Board and the Hearing Committee erroneously failed to find an additional violation of Rule 8.4(d) (conduct seriously interfering with the administration of justice) for respondent's same conduct. *See, e.g., In re Gil*, 656 A.2d 303, 304 (D.C.1995).

**1.** *In re Addams*, 579 A.2d 190 (D.C.1990) (en banc).

**2.** According to the Board's Report and Recommendation, respondent, a court-appointed conservator, intentionally misappropriated $2,500 from his ward's estate because he feared that, unless he did so, the nursing home's claims would swallow the estate and "there would be no funds left to pay my fees." *Post* at 360. In aggravation of this conduct, respondent had received an informal admonition by Bar Counsel for incompetence in an earlier, unrelated matter. *Post* at 365. In mitigation, however, the record shows that

"Bar Counsel has endorsed Respondent's remorse, his acceptance of responsibility for his conduct, and the full cooperation he has given Bar Counsel and the Hearing Committee." *Post* at 366. Moreover, the record reflects "the absence of harm to Respondent's ward[ ] and Respondent's legitimate entitlement to compensation for the services rendered," as approved by the court in more than the amount that respondent misappropriated. *Post* at 360, 366. Also, the judge of the Probate Court who referred respondent to Bar Counsel for violating the court rule against unapproved compensation, even though reminded of that referral, has appointed respondent as a conservator in two subsequent cases, as have three other judges, *post* at 362, evidencing court confidence in respondent's competence and honesty.

**3.** *In re Addams, supra* note 1, 579 A.2d at 200 (Ferren, J., concurring in result).

**4.** *Id.* at 201.

and mitigating factors as we would in any other disciplinary case."[5]

The *Addams* majority, however, essentially abandoned application of standard mitigation and aggravation analysis by adding to the presumption of disbarment a limitation that makes the presumption "virtually non-rebuttable."[6] Said the court: "[T]he mitigating factors of the usual sort, *see, e.g., In re Reback,* [*supra* note 5], will suffice to overcome the presumption of disbarment only if they are *especially strong* and, where there are aggravating factors, they *substantially outweigh* any aggravating factors as well."[7] As a result of this severe language, this court has limited exceptions to disbarment for

intentional misappropriation of client property under Rule 1.5(a) to cases of chronic alcoholism found to provide a medical excuse for the lawyer's behavior.[8] *Addams,* therefore, as predicted, has established for all practical purposes a *per se* disbarment rule.[9]

I have no sympathy for lawyers who intentionally misappropriate funds. I agree that the public deserves protection against them—a protection supplied, initially, by the presumption of disbarment announced prospectively in *Hines*[10] and reinforced in *Addams.* Once that presumption is in place, however, I believe that this court should return to *Hines's* reliance on case-by-case factual analysis.[11] In *Hines,*

---

5. *Id.* at 203. Factors in aggravation, for example, would include prior criminal behavior; other previous acts of corruption or dishonesty; and prior disciplinary sanctions. *See, e.g., In re Reback,* 513 A.2d 226, 233 (D.C.1986) (en banc). Factors in mitigation would include admission of wrongdoing; genuine contrition; prompt, volunteered restitution; full cooperation with disciplinary authorities; and an unblemished record of prior professional conduct. *See, e.g., id.*

6. *Addams, supra* note 1, 579 A.2d at 202 (Ferren, J., concurring in result).

7. *Addams, supra* note 1, 579 A.2d at 191.

8. *See, e.g., In re Miller,* 553 A.2d 201 (D.C. 1989); *In re Kersey,* 520 A.2d 321 (D.C.1987) (cited in *Addams, supra* note 1, 579 A.2d at 194–95). In a misappropriation case not involving addiction, *In re Pierson,* 690 A.2d 941, 950 (D.C.1997), we characterized the *Addams* exception as embracing a "disabling condition, such as chronic alcoholism," and cited a case, *In re Temple,* 596 A.2d 585, 589–591 (D.C.1991)—a case not involving misappropriation—in which the court accepted addiction to prescription drugs as a mitigating factor. In another case, concerning not misappropriation but violations of Rule 8.4(b) ("criminal act that reflects adversely on the lawyer's honesty," etc.), and 8.4(c) ("conduct involving dishonesty," etc.), this court recognized, in mitigation, a "psychological" compulsion. *See In re Weiss,* 839 A.2d 670 (D.C. 2003).

9. *See Addams, supra* note 1, 579 A.2d at 201 (Ferren, J., concurring in result).

10. *In re Hines,* 482 A.2d 378, 386 (D.C.1984) (two-year suspension for unintentionally commingling and misappropriating funds of two clients, engaging in conduct involving dishonesty, and intentionally prejudicing client).

11. This court has never addressed the nature or strength of the presumptions favoring disbarment announced in *Hines* and *Addams.* We can be sure, however, that they are not of (1) the "bursting bubble" variety, which would vanish upon a respondent's mere production of "some evidence" tending to show why disbarment would be unjust. *See, e.g., Brown v. Brown,* 524 A.2d 1184, 1188 (1987) ("'bursting bubble' presumption ... has no evidentiary weight once rebutted by some evidence to the contrary"). Rather, the presumption of disbarment at work here has to mean either (2) that the burden of persuasion shifts to the respondent to demonstrate—at least by a preponderance, if not by clear and convincing evidence—why disbarment is not called for, *see id.* at 1188–1190, or (3) that the burden of persuasion remains with Bar Counsel, and the burden of production shifts to the respondent, but "the presumption, even when rebutted, ... remain[s] in the case as an evidentiary element to be weighed by the judge [or other decision-maker] along with all of the other evidence." *In re D.R.J.,* 734 A.2d 162, 165 (D.C.1999) (citing *United States v. Jessup,*

we initially articulated the presumption: "[W]e take this occasion to notify the bar that in future misappropriation cases disbarment will ordinarily be the sanction imposed by this court." [12] Then came the invitation to rebuttal:

> We stress the word 'ordinarily,' for every case must turn on its own particular facts. There may be instances of misappropriation which, for any number of reasons, may call for a lesser sanction. Nevertheless, the bar should take notice that from this moment on, in disciplinary cases involving attorneys who misappropriate their clients' funds, disbarment will be the norm unless it appears that the misconduct resulted from nothing more than simple negligence.[13]

The Boards on Professional Responsibility that we have entrusted with disciplinary recommendations over the years, and certainly those from *Hines* to *Addams* and now this case,[14] have believed in the *Hines* approach, rejecting automatic disbarment

for intentional misappropriation. Their view has consistently been that, in addition to a lawyer's alcoholism or other impairment,[15] there will be instances—probably very rare—when various factors combine to make disbarment unjust. I agree with that sentiment and, in particular, with the Board's post—argument submission—indeed, its plea-in *Addams*:

> The use of mandatory sanction or so called "*per se* rules" should be avoided in the disciplinary system. Using *per se* rules leads to the perception that discipline is imposed in a mechanistic or even arbitrary manner. Although predictability may be fostered by *per se* rules, this benefit is offset by a real risk of injustice when the individual circumstances of a case cannot be taken into account in imposing sanctions. This is especially so when the *per se* rule leaves no choice but to impose the ultimate sanction of disbarment.[16]

757 F.2d 378 (1st Cir.1985)) (Breyer, J.). In *Jessup*, Judge (now Justice) Breyer characterized this third possibility as a "'middle ground' approach whereby the presumption, even rebutted, still retains 'the value of evidence.'" 757 F.2d at 383.

Presumably the evidentiary value of the presumption diminishes as the strength of rebuttal evidence increases, an inexact exercise. Nonetheless, in the context of a disciplinary proceeding, the middle ground approach to any presumption of disbarment seems the most appropriate one to me, not only because it keeps the burden of persuasion with the proponent of discipline but also because it appears to be workable, especially when applied mostly by law trained decision makers. Accordingly, as I understand it, the middle ground approach would mean, when applied in a misappropriation case under Rule 15(a) (whether *Addams* remains in force or not), that the Board and this court—while assigning Bar Counsel the burden of persuasion and permitting the respondent to offer rebuttal evidence in mitigation—would be entitled to weigh as benchmarks against that rebuttal the policies underlying the presumption of disbarment: reinforcement of client willingness to

trust a lawyer to hold client property; protection of client property against overreaching by a lawyer as fiduciary; and "public confidence in the integrity of the bar." *Addams, supra* note 1, 579 A.2d at 198. All this said, in keeping the presumption of disbarment alive as evidence, it should not amount to a barrier so high that—as in *Addams*—it effectively precludes consideration of the usual mitigating factors. *See Addams, supra* note 1, 579 A.2d at 191.

12. *Hines, supra* note 10, 482 A.2d at 386.

13. *Id.*

14. *See ante* at 351.

15. *See supra* note 8.

16. *Addams, supra* note 1, 579 A.2d at 202 (Ferren, J., concurring in result). The *Addams* Board added:

> It is often said that "hard cases make bad law." The Board has seen evidence that, because of a perception that a determination of intentional misappropriation man-

Moreover, I concur entirely with the similar view of the present Board quoted by Judge Farrell.[17]

Thus far, in addition to a finding of intentional misappropriation of client property, only conviction of a crime involving moral turpitude leads to automatic disbarment.[18] All other lawyer misconduct is evaluated without any presumption as to sanction, let alone decided by reference to a conclusive sanction policy applicable to a specified category of misconduct.[19] Our standard of review[20] and *stare decisis*, of course, foster consistent dispositions, including disbarments, in comparable cases; but these consistent results are attributable to appraisals of fact, not to a conclusive disciplinary presumption.

If I were free to reject *Addams'* harsh rule, I would vote to restore greater symmetry to our disciplinary approach by reinstating the *Hines* formulation. To do so would not create a slippery slope of lesser sanctions that induce lawyers to misappropriate funds in anticipation of discipline less than disbarment. I do not believe that lawyers behave unethically because they perceive that they can get away with

a disciplinary sanction they find acceptable. In any event, with the presumption of disbarment intact, as in *Hines,* I expect that disbarment would continue to be the strongly preferred sanction for intentional misappropriation. I also expect that the minimum discipline imposed for intentional misappropriation (absent a disability that caused the misconduct) would be suspension from practice for a period appropriate to the facts. Finally, as the Board indicates in this case,[21] the public will expect, and be satisfied with, a just result without insistence on a wooden rule to get there— indeed, a rule that requires disbarment, on occasion, when grossly out of proportion to particular facts.

I recognize that a roll-back from *Addams* will raise questions about the propriety of some previous disbarments and will require the evolution of a new jurisprudential pattern for intentional misappropriation cases. My bet is, however, that given the presumption of disbarment, the results over time will reflect little change; disbarments for such egregious behavior will remain the norm. A few individuals, however, perhaps including respondent in this case,

dates disbarment, hearing committees may have tried to fashion their fact-findings in order to avoid this result. Evasive action of this type is, of course the response to be expected from tribunals bound by rules that are felt to be Draconian when applied to a "hard" case. *Per se* rules and the resulting evasive actions are likely to lead to the issuance of *sui generis* precedents that cannot logically be reconciled. If this happens, the credibility of the disciplinary system would be undermined.

I believe that the Board overstates the danger of such skewed fact-finding by hearing committees, but, as I have observed, that may have happened in at least one case of note. *See Addams, supra* note 1, 579 A.2d at 202 n. 7 (citing *In re Buckley,* 535 A.2d 863, 865 (D.C.1987)) (Ferren, J., concurring in result.).

**17.** *Ante* at 351.

**18.** D.C.Code § 11–2503(a) (2001); *see In re Robbins,* 678 A.2d 37 (1996); *In re Colson,* 412 A.2d 1160 (D.C.1979).

**19.** Not long ago we noted: "Under this court's precedents, ... a presumption of disbarment rebuttable only by 'compelling extenuating circumstances' has heretofore been reserved for one class of intentionally dishonest conduct, that involving misappropriation of client funds.... Outside the context of intentional misappropriation, ... we have applied no such 'presumption' of disbarment as the appropriate sanction rebuttable only by 'extraordinary circumstances.' " *In re Pennington and Wiggins,* 921 A.2d 135, 141 (2007) (citing *Addams* ).

**20.** D.C. Bar R. XI § 9(g)(2) (2008).

**21.** *Ante* at 351.

will benefit appropriately from evaluation of their cases more closely along the lines that all other disciplinary cases are scrutinized, case by case, carefully weighing all the evidence, adjusting for traditional factors in aggravation and mitigation, and applying the case law that informs our work.

## DISTRICT OF COLUMBIA COURT OF APPEALS

## BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of: WILLIAM S. BACH, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 448392)

Bar Docket No. 071–05

### *REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY*

Respondent William S. Bach was the conservator of the Estate of Fannie B. Thomas, a nursing home resident and incapacitated adult ward of the Probate Division of the Superior Court ("Probate Court"). In June 2003, concerned that his ward's nursing home might exhaust the assets of her estate available to pay his own fees, Respondent petitioned the Probate Court for payment of those fees. The following month, having received no order that would have allowed him to do so, he wrote himself a check for $2,500, the lion's share of the amount he was seeking. In August, the Probate Court, unaware of Respondent's self-help, substantially granted the June petition. Respondent thereafter wrote himself a second check for the balance of the authorized amount. He admits that, at the time he took these actions, he knew court approval was re-

quired prior to any payments to himself from his ward's assets.

Bar Counsel charged Respondent with violating a Probate Court rule and three provisions of the District of Columbia Rules of Professional Conduct: namely, Rule 1.5 (collecting an unreasonable fee); Rule 1.15(a) (misappropriation); and Rule 8.4(d) (seriously interfering with the administration of justice). Respondent does not dispute these allegations but argues that the misappropriation was merely negligent—not reckless or intentional—and therefore does not warrant disbarment under the rule of *In re Addams,* 579 A.2d 190 (D.C.1990) (en banc).

Following a hearing on October 11, 2006, Hearing Committee Number Seven found that Respondent violated Rules 1.5 and 1.15(a), but not Rule 8.4(d). Concluding further that the misappropriation represented intentional misconduct, the Committee determined that the principles set forth in *Addams* and later cases require a recommendation that Respondent be disbarred.

We have closely examined the record and the detailed and comprehensive Report and Recommendation of the Hearing Committee, as well as the briefs and oral arguments of Bar Counsel and Respondent. We conclude that the findings of fact and conclusions of law set forth below, which are drawn in substantial measure from the Report and Recommendation, are supported by substantial evidence in the record, viewed as a whole. *See* Board Rule 13.7; *In re Micheel,* 610 A.2d 231, 234 (D.C.1992). Pursuant to Board Rule 13.7, we have made additional findings, including with respect to post-hearing events, and have rearranged certain of the findings of the Hearing Committee to provide context and further support our conclusions. Although we owe no deference to the Hearing Committee's determination

of such "ultimate facts" as whether the facts establish a violation of a rule and whether a misappropriation is negligent, reckless or intentional, *In re Fair*, 780 A.2d 1106, 1110–1111 (D.C.2001); *Micheel*, 610 A.2d at 234, we adopt the Hearing Committee's conclusion that the misappropriation in this case was intentional. Although we have misgivings, expressed at the end of this report, about following the *Addams* presumptive disbarment rule in the circumstances of this case, we are nonetheless constrained by that rule to recommend that Respondent be disbarred.

## I.   *PROCEDURAL HISTORY*

Bar Counsel filed its Specification of Charges on March 31, 2006, alleging that Respondent violated Rules 1.5(a), 1.15(a), and 8.4(d) when, without prior court approval, he withdrew $2,500 from the assets of Ms. Thomas to pay his own fees. Respondent was served with the Specification of Charges and, on May 11, 2006, filed his Answer, asserting that he had withdrawn his conservator's fees "with full approval" after a court auditor told him in a telephone conversation that "the Judge had signed [the] order for billed services." A hearing was held on October 11, 2006, before Hearing Committee Number Seven. . . . At the conclusion of the evidence, the Hearing Committee made a preliminary non-binding determination pursuant to Board Rule 11.10 that Bar Counsel had proven at least one violation of the Rules of Professional Conduct. The parties thereafter submitted evidence on aggravation and mitigation. After the hearing, Bar Counsel submitted proposed findings of fact and conclusions of law, to which Respondent responded.

The Hearing Committee issued its Report and Recommendation on February 8, 2007, finding clear and convincing evidence that Respondent committed intentional misappropriation and charged an illegal fee, but declining to find that he had seriously interfered with the administration of justice in violation of Rule 8.4(d). Respondent and Bar Counsel each noted exceptions.

On May 8, 2007, Respondent . . . filed a Motion for Remand to the Hearing Committee, seeking leave to present testimony that, prior to paying himself the $2,500, he had been told by a Probate Court auditor that his claim for compensation had been approved and docketed. Respondent contended that this testimony would establish that the misappropriation was merely negligent and that he had failed to address this claim during the hearing due to his inexperience with the disciplinary system. The Board denied the motion for remand on the grounds that: (1) it was untimely; (2) Respondent had been aware of the potential relevance of his alleged conversation with the probate auditor at the time that he replied to the Specification of Charges; (3) Respondent made no proffer regarding the evidence that he wished to present; and (4) Respondent did not offer any reason that the evidence could not have been presented at the hearing on October 11, 2006.

The Board heard oral argument on July 12, 2007. Notwithstanding the denial of his motion for remand, Respondent argued in his brief and during oral argument that his alleged conversation with the probate auditor established his good-faith belief that the petition had been approved and that the subsequent misappropriation therefore was negligent rather than intentional or reckless.

## II.   *FINDINGS OF FACT*

### A.   *The Challenged Payment*

1.   Respondent is a member of the District of Columbia Bar. He was admitted on

November 3, 1995, and assigned Bar Registration No. 448392, at the age of 60, following service in the U.S. Marine Corps and a career in real estate and development. As of the date of the Committee's hearing, Respondent had practiced in the area of conservatorship law for about five years and had handled approximately 50 cases.

2. On April 15, 2002, the Probate Court appointed Respondent successor conservator for Ms. Fannie B. Thomas. Ms. Thomas, who was then 92 years old, resided at Northwest Health Care Center, a nursing home located at 3333 Wisconsin Avenue, N.W., and had done so since February 1999.

3. On January 21, 2003, acting as conservator, Respondent opened a checking account for the ward's estate at Adams National Bank, Washington, D.C., entitled "Estate of Fannie B. Thomas," account number 43249001 ("Estate Account").

4. On March 13, 2003, Beverly Health and Rehabilitation Services, Inc., which does business as "Northwest Health Care Center," filed a claim against the assets of the Thomas Estate in the conservatorship proceedings. The claim sought $50,680.29 for health care and residential services furnished Ms. Thomas at Northwest since September 2000.

5. Beverly Health was represented by Gloria Johnson, who testified at the hearing on behalf of Respondent. See FF 23.[1]

6. On May 22, 2003, Respondent filed with the Probate Court his first annual accounting for the Thomas Estate, which covered the period of April 15, 2002, through April 15, 2003. It showed that as of April 15, 2003, the balance in the Estate Account was $11,662.82.

7. On June 17, 2003, Respondent filed with the Probate Court a Verified Petition for Compensation, seeking fees of $3,016.66 for 15 hours and five minutes of services rendered as conservator from May 2, 2002, through March 5, 2003, all at a rate of $200 per hour.

8. Respondent's petition was filed pursuant to Probate Court Rule 308. Rule 308(a) expressly entitles a conservator to "reasonable compensation for services rendered." To be paid from a ward's assets, however, compensation "must be approved by Order of the Court *before* being paid" ... (emphasis added).[2]

9. Probate Rule 308 implements D.C.Code § 21–2060(a) (2000), which provides:

*[a]s approved by order of the court,* any ... attorney ... [or] conservator ... is entitled to compensation for services rendered ... in connection with a guardianship or protective arrangement. Any ... conservator is entitled to reimbursement for room, board, and clothing personally provided to the ward from the estate of the ward, *but only as approved by order of the court.* Compensation shall be paid from the estate of the ward .... (emphasis added).

10. On July 28, 2003, using Estate Account check 1013, Respondent wrote a check to himself in the amount of $2,500, even though his fee petition had not yet been approved. At a hearing before Judge Burgess in the Probate Court on February 15, 2005, Respondent told the Court that he did so because of the nursing home's claim, which he feared would

---

1. Findings of Fact are cited as "FF."

2. The comment to Rule 308 states: "This ... rule is intended to implement the public policy of protecting incapacitated adults, and therefore no compensation may be paid from the assets of the subject without first being approved by the Court."

exhaust the Estate's assets, leaving no funds from which to pay his fee. ("What I was afraid of, there would be no funds left to pay my fees.")

11. In fact, when Respondent wrote check 1013 to himself, the Probate Court had not issued an order granting his fee petition or otherwise satisfying the requirement of Rule 308. Both at the hearing before the Probate Court and in his Reply to Specification of Charges, Respondent claimed that before writing check 1013 (the $2,500 check), a Probate Court auditor had told him that an order approving the payment had been signed by a judge and docketed. Judge Burgess clearly was skeptical of this claim and said as much. Before the Hearing Committee, however, Respondent offered no evidence to support that claim. He has never identified the auditor or another court employee who might have made the statement and, as Bar Counsel has pointed out, has presented somewhat different versions of this alleged conversation.

12. As an experienced Probate Court practitioner, Respondent knew that without a court order approving the $2,500 withdrawal in advance, he could not lawfully make that payment to himself. His petition for compensation even cited Probate Rule 308. Further, Respondent admitted that he "has always known the correct processes to secure fees for his legal services."[3]

13. Although an order approving a fee petition would ordinarily be mailed to counsel within one week of signature, Respondent did not receive the order approving his fee petition until early September 2003, more than one month after paying his fees from estate assets. Nothing in the record indicates that he took any action when the order failed to arrive promptly following his alleged conversation with the probate auditor. There is no evidence that he inquired of the court or restored the funds to the Estate.

14. On August 28, 2003, on the recommendation of the Office of the Register of Wills, Judge Christian in the Probate Division issued an order awarding Respondent $2,983.40 for the services described in his fee petition. At the time, she had no reason to know that Respondent had already paid himself $2,500 of the total sought by his petition. The court awarded Respondent $33.26 less than the amount sought in the petition because the court had noted a small calculation error that overstated by ten minutes the amount of time Respondent had devoted to the case. In all other respects, the petition was approved.

15. On September 10, 2003, Respondent paid himself from the Estate Account an additional $483.40, bringing his total payment to the sum approved by the Probate Court.

\* \* \*

B. *Discovery of the Challenged Payment*

16. On October 6, 2004, Respondent submitted his second annual accounting, which covered the period of April 15, 2003, to April 15, 2004.

17. The accounting reflects that Respondent paid himself $2,983.40 in conservator's fees: $2,500 by check 1013, which cleared the Estate Account on July 30, 2003, two days after its issuance and about one month before Judge Christian approved Respondent's compensation in her order of August 28, 2003, and $483.40 by

---

**3.** Further, Respondent told Judge Burgess that even with the assurances of a Probate Court auditor that an order "was docketed and it was all right to write the check ... I was a little bit nervous about writing checks without an order in my hand."

check number 1016, which cleared on September 11, 2003.

18. In its review of the second accounting, the Office of the Register of Wills discovered that Respondent had made a partial payment of $2,500 to himself before the order approving the petition for fees was issued. On January 18, 2005, it called this fact to the Probate Court's attention and suggested that the Court might wish to hold a hearing "on the matter of paying fees prior to court approval." But for that issue, it concluded, the accounting would otherwise be ready for a hearing on its approval.

19. On February 15, 2005, the Probate Court, per the Hon. A. Franklin Burgess, Jr., held a hearing to inquire into whether Respondent paid himself part of his compensation before he was authorized to do so. Judge Burgess rejected Respondent's contention that a Probate Court auditor had authorized the $2,500 payment in July, finding it particularly implausible because the fee petition was not even transmitted to the judge by the Register of Wills until August 28, 2003. He removed Respondent as conservator of the Thomas Estate and referred the matter of the unauthorized payment to the Office of Bar Counsel.

C. *Testimony in the Disciplinary Proceedings*

20. Mr. Krame, Bar Counsel's expert in the field of guardianship and conservatorship law, had reviewed the documentary record in this case. . . . He testified that his review revealed nothing to indicate dishonest conduct by Respondent in the sense of his having inflated his bills or stolen money from the Estate, other than withdrawing money without court authorization. He also concluded that Respondent

had afforded his ward "the appropriate level of care exhibited by attorneys in this area."

21. According to the witness, however, Respondent violated the requirements of Rule 308 and D.C.Code § 21–2063 (which requires a conservator to act as a fiduciary and meet the standard of care applicable to trustees) by paying himself conservator fees without the prior approval of the Probate Court. By such conduct, Mr. Krame said, Respondent "did not use the appropriate level of care" with regard to payment of his conservator fees and breached fiduciary duties described by the statute. Bar Counsel did not elicit testimony from Mr. Krame as to whether Respondent's conduct also violated D.C.Code § 21–2060.

22. Ms. Johnson, Respondent's only witness, represented Northwest Health Care Center in its dispute with the Thomas Estate, referred to in FF 4. . . . She testified that she had probably had additional professional dealings with Respondent. Based on her own experience and conversations with other Probate Court practitioners, she said that Respondent is "well known and well liked in the Court. [He's] considered to be a respected member of the Bar . . . ." On cross-examination, she added that, "Mr. Bach is considered to be and has always been considered to be a reputable, good attorney."

23. In lieu of testimony, Respondent submitted a written statement, which he adopted under oath as his sworn testimony. It summarized certain basic facts, admitted violations of Probate Rule 308 and § 21–2060,[4] and acknowledged that Respondent "violated a trust and did not uphold the honesty, integrity and trustworthiness of our Bar." In this statement,

4. This statement, RX 1, admits a violation of D.C.Code § "21–2660," but there is no provision of the D.C.Code with that designation.

In context, it is clear that Respondent was referring to § 21–2060.

Respondent denied that he intended to do so, but also said that "there are no relevant excuses for doing so." In response to a question from the Hearing Committee, Respondent testified that the nursing home's claim was a motivating factor.

24. Following the Hearing Committee's preliminary, non-binding determination that Bar Counsel had established a violation of at least one disciplinary rule, the parties presented evidence on aggravation and mitigation.

25. In aggravation of sanction, Bar Counsel introduced a copy of an informal admonition issued to Respondent on July 17, 2003, for incompetence in a case unrelated to this one, in violation of Rules 1.1(a) and 1.1(b). The allegation was that Respondent failed to exhaust administrative remedies before filing an employment discrimination complaint in Superior Court, with the result that the lawsuit was dismissed.

27. In mitigation, Assistant Bar Counsel Bowman advised the Hearing Committee that Respondent "has been nothing but cooperative in these proceedings and has saved Bar Counsel and the disciplinary system, a fair amount of aggravation, and I would just point that out to the Committee."

28. Respondent testified on his own behalf in mitigation. He noted that, after Judge Burgess removed him as conservator of the Thomas Estate in February 2005, Respondent remained on the Probate Court's list for appointment as conservator by fulfilling a mandatory Continuing Legal Education requirement. Moreover, since referring this case to Bar Counsel, Judge Burgess has appointed Respondent to two cases, both apparently in 2006, after being reminded by the Register of Wills of the prior removal proceeding. Three other judges have also appointed him to cases.

29. Respondent also listed a variety of civic and community activities and achievements to support mitigation of the sanction in this case.

30. In its Report and Recommendation, dated February 8, 2007, the Hearing Committee issued proposed findings of fact and conclusions of law that Respondent had intentionally misappropriated entrusted funds in violation of Rule 1.15(a) and collected an illegal fee in violation of Rule 1.5.

D. *Proceedings Before the Board*

31. On May 8, 2007, almost seven months after the conclusion of the hearing and three months after the issuance of the Hearing Committee's Report and Recommendation, Respondent, through counsel, filed with the Board a Motion for Remand to the Committee. Respondent contended that, as a result of his inexperience with the disciplinary system, he had failed to present testimonial evidence at the hearing to support his claim that he had been told by someone in the court's auditor's office that his claim for compensation had been approved and docketed, and that this was the "heart of Respondent's claim that his misappropriation of the estate funds was negligent." Respondent requested that the Board "remand this matter for a further hearing on [his] claims regarding his belief that the Court had approved his disbursement of legal[ ] fees out of estate funds and further findings with respect to whether his misappropriation was the result of simple negligence or its equivalent."

32. On May 14, 2007, Bar Counsel filed an Opposition to Respondent's Motion for Remand.

33. On May 25, 2007, the Board denied Respondent's Motion for Remand, finding as follows:

Board Rule 12.1(c) provides that the record before the Hearing Committee may be held open for not more than seven

days after the close of a hearing and that no additional evidence may be submitted thereafter, unless otherwise ordered by the Chair of the Hearing Committee. The hearing in this case closed on October 11, 2006, and Respondent's motion for remand to consider additional evidence was filed seven months later. We find that the motion fails to provide sufficient grounds to re-open the record and to remand this matter at this late date, and for the following reasons: (1) notwithstanding his claimed "inexperience," Respondent's answer to the Specification of Charges demonstrates that he was aware of the potential relevance of his alleged conversation with the probate auditor about which he wishes to supplement the record; and (2) Respondent has neither proffered the evidence that he now wishes to present nor has [he] offered any reason that the evidence could not have been presented at the original hearing on October 11, 2006. As the Hearing Committee noted,

Respondent offered no evidence, not even the name or vaguest description of the auditor to support that claim. There is no evidentiary basis in the record then, on which the Committee, the Board or the Court could support what appeared to be Respondent's principal, perhaps *only,* defense.

## III.  *CONCLUSIONS OF LAW*

### A.  *Misappropriation—Rule 1.15(a)*

Respondent does not deny that he misappropriated entrusted funds in violation of D.C. Bar Rule 1.15(a). In the District of Columbia, "misappropriation" means "any 'unauthorized use by an attorney of a client's funds entrusted to him or her, whether or not temporary or for personal gain or benefit.'" *In re Davenport,* 794 A.2d 602, 603 (D.C.2002) (citations omitted). *See, e.g., In re Fair,* 780 A.2d 1106

at 1109; *In re Pierson,* 690 A.2d 941, 947 (D.C.1997); *In re Harrison,* 461 A.2d 1034, 1036 (D.C.1983). *See also In re Soininen,* 889 A.2d 294 (D.C.2005) (per curiam) (misappropriation by court-appointed guardian and conservator); *In re Utley,* 698 A.2d 446, 449 (D.C.1997) (misappropriation by a conservator). Withdrawing $2,500 from the Estate before Respondent's fee petition had been acted on was an unauthorized use, and Respondent has admitted such misconduct in this case. *E.g.,* FF 11, 24; *see also* Reply to Bar Counsel's Proposed Findings of Fact at 2–3 ("The case is clear that Respondent paid his fees without an ORDER from the Court." "Respondent admits his error and did not follow the correct procedures as demanded [of] all attorneys at the Bar."). Accordingly, the record contains clear and convincing evidence that Respondent violated Rule 1.15(a), as well as Probate Court Rule 308 and D.C.Code § 21–2060(a).

### B.  *Degree of Culpability*

The key issue is whether the misappropriation resulted from Respondent's simple negligence or was intentional or reckless. *See, e.g., In re Anderson,* 778 A.2d 330, 339 (D.C.2001); *Addams,* 579 A.2d at 190. The answer is critical inasmuch as it will determine whether Respondent will be suspended for six months, the typical sanction in cases of negligent misappropriation, *Anderson,* 778 A.2d at 330, or will face disbarment, "the *only* appropriate sanction" for reckless or intentional misappropriation except in extraordinary circumstances. *Addams,* 579 A.2d at 191 (emphasis added).

Here, Bar Counsel has proven by clear and convincing evidence that Respondent acted intentionally when he paid himself from the Estate assets without the Probate Court's prior approval. Respondent admitted that he did so deliberately be-

cause he feared that the Estate would otherwise be depleted by the nursing home's claim. *See* FF 24. Both before the Probate Court and in this proceeding, Respondent openly admitted that the nursing home's claim prompted him to withdraw the $2,500 to protect it as a source from which his bills might be paid. ("I paid myself in order to stop the claims of the Nursing home's attorney Gloria Johnson, Esquire, and the business agent of the Nursing Home.") [;] ("What I was afraid of, there would be no funds left to pay my fees.").

Although Respondent had a reasonable and legitimate expectation that the Probate Court would approve his fee petition, as it ultimately did (subject to the correction of a computational error), Probate Rule 308 and D.C.Code § 21–2060 clearly required Respondent to have the advance approval of the Probate Court before paying himself. This requirement, which exists to safeguard the assets of the incapacitated, was not satisfied until more than a month after Respondent helped himself to the $2,500. As an experienced Probate Court practitioner, Respondent knew that whatever his ultimate equitable entitlement to compensation, without a Court order approving the $2,500 withdrawal in advance, he could not lawfully make that payment to himself. FF 12. The violation occurred when Respondent withdrew $2,500 from the Estate's assets without advance court approval, which he knew was required before he could make the withdrawal. *See, e.g., In re Utley,* 698 A.2d at 449–50; *In re Pierson,* 690 A.2d at 944–45 & 948. Like the respondent in *In re Berryman,* 764 A.2d 760, 773 (D.C. 2000), Respondent "placed [him]self ahead of all other creditors, without the approval of the Probate Division." This violation was not cured by the Court's subsequent approval of the payment, or by the fact that the total received by Respondent con-

formed to the amount actually approved by the Probate Court. *See, e.g., Utley,* 698 A.2d at 450 (Probate Court's ultimate approval of fees did not act as a ratification of unauthorized taking of unapproved fees). *See* FF 15–16.

Before the Board, Respondent argues that he relied in good faith on an alleged conversation with an auditor of the Probate Court, in which he was supposedly told that the petition either had been, or shortly would be, approved. We need not decide whether such reliance, if proven, would justify a determination that Respondent's misappropriation was negligent, *cf. In re Berryman,* 764 A.2d at 772 (collecting cases finding negligence where attorney was under the honest, but mistaken, belief that he or she was entitled to the use of funds that were in fact required to be maintained in trust), because here, no record evidence supports Respondent's claim. Respondent did not address it either in his remarks to the Hearing Committee or in the written statement that he adopted under oath during the hearing. He acknowledges that "he did not so much as mention his reliance on the telephone conversation as it related to the misappropriation." Respondent "also recognizes that this lack of a record is nobody's fault but [his] own." Given Respondent's complete failure to present any evidence regarding this conversation, the Hearing Committee understandably concluded that he had abandoned this defense. (Indeed, although Respondent renewed his request to remand the matter to the Hearing Committee both in his brief and at oral argument, he has still failed to identify the auditor with whom he allegedly spoke or to proffer any evidence. *See* FF 11.)

We are therefore left with a record in which Respondent admitted that he deliberately paid himself from the Estate prematurely, knowing it to be a violation of

applicable rules, with "an intent to treat the funds as [his] own," [*Anderson*, 778 A.2d at 339,] with no justification for his actions. Moreover, Respondent's sworn admission that he "violated a trust" and failed to "uphold the honesty, integrity and trustworthiness of our Bar," FF 24, is not consistent with his contention that he acted in good faith reliance on a court official. Clear and convincing evidence thus demonstrates that Respondent's violation of Rule 1.15(a) was intentional.

\* \* \*

#### D. *Unlawful Fee—Rule 1.5(a)*

Rule 1.5(a) and (f) require that a lawyer's fee not be one that is prohibited by law. Bar Counsel charged that Respondent violated this requirement by taking a fee, the $2,500 represented by check 1013, without the advance approval required by Probate Court Rule 308 and D.C.Code § 21–2060. Respondent admits that he took the fee and that it was unreasonable and thus a violation of Rule 1.5(a) to have done so. Reply to Bar Counsel's Proposed Findings of Fact at 4. These concessions clearly and convincingly establish a violation by Respondent of Rule 1.5(a).

\* \* \*

#### IV. *RECOMMENDATION AS TO SANCTION*

The rules for sanctions in misappropriation cases in this jurisdiction were set out in *In re Addams*. There, the Court said that, "in virtually all cases of misappropriation, disbarment will be the only appropriate action unless it appears that the misconduct resulted from nothing more than simple negligence." *Addams*, 579 A.2d at 191. This is not a *per se* rule, however. A lesser sanction may be appropriate in "extraordinary circumstances," such as those found in *In re Kersey*, 520 A.2d 321 (D.C.1987), where an attorney's alcoholism was taken to mitigate an intentional misappropriation he committed during the period of his alcoholism. *See Anderson*, 778 A.2d at 335.

Neither in his brief to the Board nor at oral argument did Respondent assert that this case presents extraordinary circumstances warranting a departure from the rule of presumptive disbarment. *Addams* sets the "extraordinary circumstances" bar high, and the facts here fall short. The mitigating factors here are not strong enough to overcome the disbarment presumption, nor do they substantially outweigh the aggregating factors.[5] Most importantly, Respondent's prior disciplinary record is a substantial aggravating factor. In 2003, Respondent received an informal admonition for incompetence in his handling of the *Sharma* matter. *See* FF [25]. In *Sharma*, Respondent failed to comply with the plain meaning of Title VII requiring an administrative complaint to be filed before a lawsuit could be maintained. That violation was troublingly similar to his failure in this case to comply with the plain meaning of another statute and of the rules of the Probate Court, demonstrating a pattern of ignoring the abundantly clear wording of relevant law. The intentional and serious nature of Respon-

---

5. For an explanation of "usual mitigating factors" that must be especially strong to overcome the presumption of disbarment, the *Addams* Court referred to *In re Reback*, 513 A.2d 226 (D.C.1986) (en banc). Factors mentioned in *Reback* were that the respondents (1) admitted their wrongdoing and cooperated fully throughout the disciplinary proceedings; (2) made prompt restitution; and (3) "[m]ost important … [respondents] have had unblemished records of professional conduct during 30 and 15 years of practice, respectively." *Reback*, 513 A.2d at 233. *See also Pierson*, 690 A.2d at 950–51; *Addams*, 579 A.2d at 192 n. 4–5.

dent's misconduct is another substantial aggravating factor.

Moreover, this case does not present sufficient mitigating factors to qualify Respondent for exceptional treatment under *Addams* or to enable the Board to recommend a sanction short of disbarment. To be sure, Bar Counsel has endorsed Respondent's remorse, his acceptance of responsibility for his conduct, and the full cooperation he has given Bar Counsel and the Hearing Committee during these proceedings, *see* FF 27, and all of these factors may have some weight in mitigation. *See, e.g., In re Weiss,* 839 A.2d 670, 673–74 (D.C.2003); *In re Schneider,* 553 A.2d 206, 212 (D.C.1989). Respondent's reputation and his subsequent appointments by the Probate Division also weigh in his favor.

Before the Hearing Committee, Respondent also cited as mitigating factors the relatively short duration of the misappropriation, the absence of harm to Respondent's ward; and Respondent's legitimate entitlement to compensation for the services rendered. Reply to Bar Counsel's Proposed Findings of Fact. These facts certainly make the misappropriation less egregious than it might otherwise have been, but they do not alter its intentional character.

Nothing, however, distinguishes this case from others in which the Court has found similar mitigating factors to be insufficient. *See, e.g., In re Berkowitz,* 801 A.2d 51, 57 (D.C.2002) (per curiam) (respondent's return of misappropriated funds, though a "mitigating factor," does not qualify as "special circumstances" for a departure from disbarment under the *Addams* rule); *In re Berryman,* 764 A.2d at 773 ("absence of a prior disciplinary record ... even when coupled with other mitigating factors, is not a sufficient [*sic* ] to overcome the presumption of disbarment"); *In re Pierson,* 690 A.2d at 949–50

(absence of prior disciplinary record, history of *pro bono* work, and forthrightness with Hearing Committee and Board do not warrant departure from the *Addams* rule); *In re Clarke,* 684 A.2d 1276, 1281 (D.C. 1996) (per curiam) ("respondent's lack of prior disciplinary history, his financial distress, and his cooperation with Bar Counsel do not qualify as mitigating factors sufficient to justify departure from the sanction of disbarment."). *See also In re Robinson,* 583 A.2d 691, 692 (D.C.1990) (respondent disbarred for misappropriation despite relatively small sum involved, quick restoration of funds, lack of financial harm to client, single instance of misappropriation, respondent's relative inexperience, absence of prior disciplinary record, and favorable character testimony).

Consequently, the Board does not find on this record any extraordinary circumstances that would justify excepting Respondent from the *Addams* rule of presumptive disbarment for misappropriation resulting from more than simple negligence. Accordingly, we are required to recommend that Respondent be disbarred.

\* \* \*

## V. CONCLUSION

For all the foregoing reasons, the Board finds that William S. Bach, Esquire, violated D.C. Rules of Professional Conduct 1.5(a) (unreasonable fee) and 1.15(a) (misappropriation), as alleged by the Specification of Charges, and recommends that he be disbarred.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: _____

Deborah J. Jeffrey

Dated December 20, 2007

All members of the Board concur in this Report and Recommendation except Ms.

Coghill–Howard and Mr. Smith, who did not participate.